Good morning. May it please the court, Robin Cooley on behalf of the appellant, I'd like to start with the pilot knob alternative and then turn to methane flaring. Before opening more than 19,000 acres of formerly protected roadless area to the devastating impacts of coal mining, the federal government failed to consider a reasonable alternative that would have protected the pilot knob roadless area in its entirety, but still allowed access to 128 million tons of coal in two other roadless areas. Now this alternative squarely meets the Forest Service's purpose and need for this project, which was to balance the competing interests of roadless protection with opportunities for coal mining. And it's significantly distinguishable from all the other alternatives that the agency considered for three primary reasons. The first, as I mentioned, is that it would protect an entire roadless area intact. And that's for species and other roadless values. The second reason it's distinct is that there is no active coal mining currently in the pilot knob area. But there is a lease, right, that's existent? Lease or leases? Yes. And existing leases are grandfathered in under the Colorado roadless rule. So it doesn't affect the existing lease. It just affects future opportunities beyond that existing lease. Well, with an existing lease, doesn't that tell us that, and a mine, even though it's now closed, doesn't that tell us that there's a potential for mining there? Well, first of all, that was not the reason that the agency gave in the record. But even if we set that aside, there's still a problem with that argument because that rationale that somehow there are proven coal reserves because of the Elk Creek mine applies equally, if not more so, to alternative C, which is an alternative that the agency did consider in detail. And under alternative C, the portions of the sunset area that are in wilderness-capable lands are areas where the West Elk mine, and would have been closed under alternative C, are actually areas where the West Elk mine is seeking currently to mine. They are included in one of the lease modifications that's at issue in this case. So it's simply not reasonable to say that, you know, the coal reserves are more proven in an area where you have a closed and reclaiming coal mine than in an area where you have an active mine that's wanting to proceed into that area currently. Well, alternative C would have entirely foreclosed access to coal in this Pilot Knob region, wouldn't it? Except for the existing lease. And weren't they trying to balance? So there was some access here and there. Exactly. And why is your alternative C better than or in lieu of what the Forest Service took a hard look at? Our alternative is... You're going to burn methane, you're going to flare methane. That in and of itself is a problem. Are you asking about the Pilot Knob alternative or the methane flaring? Well, both. I mean, there are a lot of things taken into account. And I want to know why you think your alternative is the best and should have been adopted as opposed to what the service did. So this court in New Mexico, X. Roy Richardson, made it very clear that there are four factors that you apply to determine whether an alternative is reasonable. And our argument is that our agency... So therefore, even if their alternatives also meet those four factors, yours must be taken? Yes. Okay. Must be considered. Must be considered. Not exactly, yeah, not taken. Exactly. It must be considered. And I think its entire... It was considered, wasn't it? It was not adopted. It was considered, though. It was rejected from detailed consideration. And so our argument is that it should have been considered in detail. And I think it's entirely reasonable. Here you have an opportunity for the... Is the word detailed consideration a statutory term? No, it's just a term... I understand what it means, but... It is not found in the statute. And we've covered two of the reasons that the pilot knob area is distinguishable. One being that it protects the entire area. There's no active coal mining there. But the third reason is that the Forest Service itself has recognized that this area has especially high values for wildlife, including threatened and sensitive species. So let me understand your answer to Judge Briscoe's first question regarding the effect of the leases that exist in the knob hill area. Are you saying that your knob hill alternative proposal included accommodation of those leases? No, it was not from our alternative. The Colorado those leases predate the adoption of the Colorado roadless rule. So it does... Not your proposal itself, but the law accommodates those leases. Exactly. All right. And do we know how a potential future exploitation of those leases or utilization of those uses would impact the roadless area designation here? That's not something that the agency has looked at in this case. All right. Thank you. So here the agency had the opportunity to protect an entire roadless area without affecting current mining, and its failure to do so was unreasonable. Turning to methane flaring, here the agency's authorized leasing of publicly owned coal to the largest industrial source of methane in all of Colorado without considering a single alternative that would have mitigated those climate emissions. So your argument is that it didn't consider the flaring proposal at all? It just... Not on the radar. Sorry, we're not going to consider it. No, again, it was considered and rejected from detailed consideration. So what that means is that in chapter two of the EIS, they said, these are all the various alternatives that have been proposed, and we're not going to study them any further. And we are challenging that decision. Is there any place in the United States where flaring exists, where it's utilized? Yes. Right down the street from the West Elk Mine is the closed Elk Creek Mine, and their flaring has been occurring since about 2012. And is the mechanism widely available for that proposal, considering the safety to miners? Yes. So I think this is an important point, because if we look at the record, first of all, the agency never says, they never say that it is not possible to design a safe system for the West Elk Mine. And in fact, all the evidence in the record indicates that it is. So Mountain Coal's own consultant analyzed flaring back in 2009. They did not conclude that it was technically infeasible. They just concluded that it wasn't profitable. Our own consultant analyzed methane flaring in 2017 and concluded that it was not only technically feasible, but that it could be profitable. Well, it's not BLM or the U.S. Forest Service's job to get into that area, is it? It is absolutely their job. I thought it was another agency that evaluated the potential on methane flaring. I believe you're referring to the Mine Safety and Health Administration, or MSHA. So there are different obligations at play here. The Forest Service and the BLM have an obligation at the leasing stage to consider the impacts of that decision and to consider mitigating those impacts as well. Now, the Mine Safety and Health Administration approves the mine ventilation plan and ensures that the mine is safe. But there's three problems with the agency just throwing up their hands and saying, well, we can't look at this because we don't know what MSHA is going to do with it. And the first is that... Well, you don't even really have a mine yet, do you? I mean, how can you determine where you should, or how you should, or if you should, or if there's a need for methane flaring? I mean, it's rather hypothetical, isn't it? Well, the evidence shows that Mountain Coals' consultant was able to fully analyze methane flaring as early as 2009. Our consultant also fully analyzed... Yeah, generally, but I mean, don't you have to really get down to the site and what is generated and how you could put in your, whatever technology this requires, if it works? I mean... Certainly... It seems premature at this point to me. Tell me why that's wrong. Sure. Certainly, the proposal can be refined over time, but there is nothing in the record, and the agency doesn't point to anything that suggests that additional information will make it impossible to do methane flaring at this site or make it unsafe. So... Well, is that the test? Impossibility? Well, the standard that this court set out in New Mexico X Ralph Richardson is the agency has to consider it if it's reasonably possible to do so. So, in this case, there is a wealth of information for the agency to consider now, and... Well, technically, that flaring is a possibility, right? What else do we have to know whether flaring should be used in any specific mine when we don't have any mines yet, as far as I understand? Yes, but there is ample information about... They've been flaring methane in this area for years. So, for example, our consultant looked at the last three years of flaring data and averaged that and did an assessment based on that. So, I think it's... I don't understand. What's the relief that you ask of us with respect to flaring? We want the Forest Service and BLM at the leasing stage to consider a methane flaring alternative in detail. Well, but as Judge Briscoe says, I mean, you can consider it in theory, but you can't consider it in fact without even having a mindset to consider it for, right? Well, again, there's... What are we missing? I think part of the problem may be our lack of expertise in the field. So, you've got to fill in the blanks for us if you're going to ask us for help. Sure. The information that's available now is that two consultants have looked at this and used... Have looked at what? The historical data. The possibility of using methane flaring as a potential use around the world? Yeah. Well, sure. Okay. No. Potentially of using it at this mine with this mine's... What mine? The West Elk Mine. So, are we considering two separate, totally separate issues? Number one, the roadless area at the Dove Hill, and the second is a discrete application of flaring at a given mine? Yes. How did they mix up these two cases together? This is why we have oral argument. We must have had a bad... I think we must have had a bad chance. This has been helpful. Thank you. I do want to make one point about the... No, no, no. Let's get to the bottom of this before you make another point. It's on this point. Oh, all right. I just want to point out the shell game that the agency has played here. At the rulemaking stage, they said, this is something that should be considered at the leasing stage. At the leasing stage, they said, we're deferring that to the mine plan stage. And at the mine plan stage, the Office of Surface Mining said, hey, they already considered that at the leasing stage. So, as a result, no agency has or ever will consider methane flaring prior to mining happening in this case. And we are talking then about a discrete mine that already exists. Yes. Because, as I understood, this part of this case, which is an extension of a lease already held... Yes, this mine is actively mining in the area. MCC is doing it. And they want to extend this mine. And you're saying, if you're going to extend it, you need to flare. Yes. Got it. Thank you. Thank you. I'll reserve the rest of my time. Thanks. May it please the Court. I'm John Arbab on behalf of the Federal Appellees. With me at council table is Mike Drysdale on behalf of Intervenor. I'd like to argue for 10 minutes and reserve five minutes to Mr. Drysdale. And I will attempt to watch the clock. Your Honors, I guess I'll pick up on the flaring issue, because that was where we left off. Well, yeah, I think that's a good place to pick up. But why don't you pick up a little couple of steps before that. What mad merger of cases do we have here? A roadless area designation study and a discrete coal mine application. Is that what we've got going? And how come they mix these two cases together? Your Honor, these... Sounds like you're making a souffle and a baked ham. No, Your Honor. These are just two of many, many issues that were covered in the two supplemental final EISs that were prepared after the prior lawsuit and problems with the original EISs were identified by the District Court. So now the plaintiffs are seizing on two aspects that are different from the supplemental EIS process. The first is the pilot knob issue, and the second is flaring. Can we talk about that one first, then? Which one, Your Honor? The knob hill roadless pilot study. Yes, the pilot. All we're talking here is whether that should have been considered as an alternative, correct? That's right, Your Honor, because... And it was not considered as an alternative. And as I understand, the rationale for not considering it was that another alternative that subsumed some aspects of this same issue was considered. That is alternative C. That is part of the argument, Your Honor, but a different aspect of this argument has to do with what counsel was referring to as the other recently active but now closed mine in the pilot knob area called the Elk Creek Mine. And the agency thought, the Forest Service thought that this was a significant distinction between the pilot knob area, which is where that mine is, and alternative C, which is a different area in a different part of the North Fork coal mining area. And the important distinction that the agency drew with respect to the West Elk Mine, with regard to the Elk Creek Mine, is that if you accepted the pilot knob alternative, which is to withdraw that area from the larger North Fork coal mining area, you would foreclose the possibility of access to coal reserves in the area of this Elk Creek Mine, which admittedly is recently closed but had been active until as recently the end of December of 2015. And so the existence of that mine, as to which there's no comparable mine in the alternative C carve-out area, that's significant because it shows where there could be recoverable coal in the pilot knob area. And that's further significant, the Forest Service found, because in this larger, almost 20,000 acre North Fork coal mining area, almost 80% of that area has not been explored. So it is really not known at this point where there might be potentially recoverable coal. But existence of the West Elk Mine is a clue that there could be recoverable coal in this area. Where's the West Elk located? It's in the pilot knob area. And so, oh, I'm sorry, Your Honor, that's Elk Creek. The West Elk Mine is in the Sunset Colorado roadless area. And which alternative? Which alternative does it fall within? A, B, C, or pilot knob? The existing coal mine. Yes. It falls within alternative B, which is to reinstate the Colorado roadless rule as it had been originally promulgated prior to the earlier adverse district court opinion. So do we look at, when we have the charts that everyone gives us about the amount of coal that's in these alternatives, is that something we should consider here? And we note when we do that, that there is more coal allegedly accessible in the pilot knob alternative than there is in the alternative C alternative. And if the idea is to get more coal, it seems logical one would like to consider the pilot knob alternative within the analysis. Your Honor, I think it's important there to remember the context in which this supplemental EIS was being done, which was to respond to the district court's earlier ruling that the Forest Service had not disclosed the amount of greenhouse gas emissions that would result from burning North Fork coal mining area coal. And so this is where the agency decided that to answer that question, it was sufficient to have the three alternatives that were carried over for a detailed study, A, B, and C. But the requirements for EIS and NEPA's general aims are still out there and applicable when you produce a supplemental EIS. That doesn't change. You still have to comply and satisfy those requirements regardless of what a district court did or didn't do in the interim, right? Well, the district court had made this finding earlier. The agencies were responding to that decision in this supplemental document. But in your response, don't you still have to satisfy the general rules and the law? Yes, Your Honor, that's true. But within the context of the question that the agency was attempting to answer... What gives us that limitation? Where do we get that? I mean, that's something you're admitting that you did, but is that proper? I think so, Your Honor, because it's in the nature of a supplemental EIS. In the original EIS, there had been a full-blown, and now not in controversy, detailed analysis of reinstating the North Fork coal mining, or implementing the North Fork mining exception. And in that earlier study, had flaring been considered? No, it wasn't an issue at that point. It was brought up at the supplemental stage. Was pilot knob alternative considered? I don't think so, Your Honor. No, again, that was something that was brought up at the supplemental stage. So here the agency's... So with respect to both proposals, they have not, at this time, been considered at all? Neither at the earlier stage, nor at this stage, nor at the recommended stage? They weren't at the earlier stage, because they weren't brought up by the plaintiffs at that point. They were at the supplemental stage. They were considered, but rejected from detailed study as permitted by the NEPA regulations. And the agency gave their reasons for not carrying them forward for additional detailed studies. But it's not as if the flaring and pilot knob were not considered at all. They were, but they were weeded out at the initial stage before the agency went on to focus its major efforts on the alternatives A, B, and C that were carried forward. So I think back to Judge Briscoe's question. Alternatives A, B, and C were a reasonable range of alternatives. The agency carefully looked at that and said, look, we're taking a low production scenario, a middle production scenario. A is the low production scenario. Alternative C is the middle production scenario. And alternative B, the preferred alternative, is the high production scenario. We're going to calculate the greenhouse gas emissions from each of these three and disclose them to the public and to the decision maker. And that's exactly what the agency did. What is the goal of mining in this area, of opening up this portion of the roadless area to mining? Don't we have general goals that we're aimed at here? That is production of more coal. That is consideration of the local economy, the people that live and work there. All these things play into it, right? Yes, Your Honor. Yes. I mean, in the 2012 Colorado roadless rule rulemaking, all of these different interests, different stakeholders were involved in the process. And if you will, the compromise that was reached was that the Colorado roadless rule would protect 4.2 million acres of federal land in the state of Colorado from road building. And a very small, like 0.5 percent of that 4.2 million acres, a tiny area, the North Fork coal mining area, a narrow exemption would be made for that area so as to allow the continuance of a historic activity that had been going on in this part of Colorado for 100 years or so. And so that was the compromise that was reached. Is there a present recreation use of the area? Yes, Your Honor. This is part of a national forest. And so if someone wants to go, I don't know, hiking or off-road bicycling in the North Fork coal mining area, there's nothing preventing anyone from doing that. Unless there's a mine in the middle of it. Well, you probably would skirt around the mine, but as far as the regulations. Let's go hiking at the coal mine. Well, there's not much active coal mining going on in the area. So this is all anticipatory. Yes, Your Honor, I see that I'm cutting into Mr. Drysdale's time. So unless there are further questions. Your Honors, Mike Drysdale for Mountain Coal Company. I'm going to focus on flaring. I don't believe the roadless, the pilot knob piece implicates the mine because the presumption is that mining would be allowed in the West Elk area. So even if you find there's an error regarding a pilot knob, it should not affect the roadless rule as it applies to where our mine is or the leasing decision for this mine. So as to flaring. So we could actually rule one way on one without affecting your issue. Exactly, Your Honor. So on this issue of flaring and when it's to be considered in the consideration, I'm going to start with a statement made in the plaintiff's reply brief, which says nothing prevents the agencies from imposing flaring only if MSHA approved it as safe. We agree. MSHA is the agency that is the one that is to be deciding this. But that's not what they argued to the agencies or to the district court. What they argued, what they mean by detailed consideration is that the BLM and the Forest Service must compile sufficient information at the leasing stage so as to be able to determine definitively that that's where we struggle with what they've required at what they're asking for at the leasing stage. That's where we believe that is an usurpation of MSHA's statutory responsibility. So is counsel correct in saying there's a shell game going on here? No, Your Honor. We were at the leasing stage and everyone said, no, no, we can't talk about flaring now. That comes in later at the planning stage. Mine planning stage. Mine planning stage. I can't read my own writing. And then when that stage was reached, it was said, I'm sorry, we've already looked at that. No, no. It was, again, there's a distinction here. At the mine plan stage, and to be clear, that is being litigated. We have a hearing on the merits in the Colorado District Court on October 17th on that. So is flaring being considered at that trial? Yes. Say again what's being considered? So the mine plan and the adequacy of the analysis of flaring is being actively litigated right now based upon OSM's decision on the mine plan. Litigated, not considered. No, the decision's already been made. Not to do it or to do it. The supplemental analysis that was required by the lease stipulations was prepared. The conclusion, and it was our report, we concluded that the conceptual mine plans, the conceptual reports they advocated were not economic, did not meet the economic test. It was not challenged. It's been true since 2009 and was not challenged in the litigation. And OSM concluded that the environmental impacts of flaring were already adequately described in the leasing EIS because we all know 87%, there's an 87% reduction in carbon footprint. And we're litigating right now whether that determination was adequate. And there's a hearing on the merits on October 17th. So in a way, they are correct that you're saying in the present hearings that that's already been considered and not required. No. Again, there's a distinction here between environmental, economics, and safety. The economics and safety were considered in great detail after the leasing stage when we looked at the exploration data we received from mining. Remember, there was no exploration data for this area at all until we were granted a lease. We had to figure out how deep is this coal from the surface? What are its characteristics? And that's the other thing. MSHA does not approve conceptual mine plans. What MSHA looks at is what exact equipment are you proposing to use? How is the air going to flow through this exact layout of the mine? None of that could have been done at the leasing stage. The key here is that- But it's never going to be done if it's not proposed, correct? No, it was done. Economics and safety- In a given mine, nobody's going to study its safety, efficacy, safety to the miners, et cetera, et cetera. Because it's not proposed. No, but the economics were considered in detail. We concluded it was not economic. And that's necessary because you've got to have a specific- The whole concept of clean coal was that coal could be mined and utilized safely without environmentally safety. And I hear you saying, well, it's all a matter of cost. And if it's not- No, we're not saying it. To be clear, we are not opposed to flaring, okay? We will certainly- Our permits already require us to do that. Government Appendix 725, we lay out. We are already required to flare if it can be shown to be economic and if it can be shown to be safe. That was never contested. Now, they now disagree with the economic standard. If you look at their reply brief, they say, well, we don't like that economic standard. We think it's the wrong one. But that argument was never raised to the district court. And so because we could not come up with an economic configuration, we did not propose a specific configuration to MSHA. If at some point, and this is something we continue to look at, we're able to come up with something, we will certainly propose it and then we'll see whether MSHA approves it. Okay. Thank you. Thank you. Give it a minute, a minute and a half. Appellant? Sorry, Chief. Thanks, Amy. Thank you, Your Honor. I just want to make two points about the methane flaring. The Mine Safety and Health Administration does not have the authority to mandate that methane flaring occur. That authority rests with the BLM and the Forest Service at the leasing stage when they put conditions on the lease modifications. As far as the economic test... Well, do you agree that the issue of the economics of mine flaring in this particular mine is presently under consideration? So our proposal is for a mandatory methane flaring alternative. What is in the lease stipulations now and what we're trying to change, we are trying to make it mandatory, is voluntary. And what it says is you can look at these things over time and if you decide it's economic, and let's be clear what that means, is that you can profit from it. Then maybe we'll do it later. But what we are saying is this is a mitigation measure and for no other mitigation measure that the agency has ever considered in my experience, do they look at whether the company can profit from it? It's simply an analysis of what mitigation needs to happen and in particular in this case, the record of decision lists numerous different mitigation measures that have to be taken for species, for cultural resources, for subsidence issues, and they make it clear that the company is responsible for paying for those mitigation measures. And the one that's missing is climate. That's all. Thank you. Thank you. Thank you. Thank you, counsel. Thank you all for your arguments this morning. The case is submitted.